IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| DIA-DEN LTD. | § | CASE NO. 15-32626-H4-11 |
| | § | |
| DEBTOR | § | CHAPTER 11 |
| | § | |
| | § | |
| | § | Judge Bohm |

## DISCLOSURE STATEMENT UNDER
## 11 U.S.C. § 1125 AND BANKRUPTCY RULE 3016 IN SUPPORT
## OF DEBTOR'S PLAN OF REORGANIZATION OF DIA-DEN LTD.

THIS DISCLOSURE STATEMENT IS SUBMITTED TO ALL CREDITORS OF THE DEBTORS ENTITLED TO VOTE ON THE PLAN OF REORGANIZATION HEREIN DESCRIBED AND CONTAINS INFORMATION THAT MAY AFFECT YOUR DECISION TO ACCEPT OR REJECT THE DEBTOR' PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE.  THIS DISCLOSURE STATEMENT IS INTENDED TO PROVIDE ADEQUATE INFORMATION AS REQUIRED BY THE BANKRUPTCY CODE AS TO THE DEBTOR'S PLAN OF REORGANIZATION.  ALL CREDITORS ARE URGED TO READ THE DISCLOSURE STATEMENT AND ATTACHMENTS WITH CARE AND IN THEIR ENTIRETY.

ON _____ 2015, THE BANKRUPTCY COURT APPROVED THIS DISCLOSURE STATEMENT AS CONTAINING ADEQUATE INFORMATION UNDER SECTION 1125(b) OF THE BANKRUPTCY CODE.  SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN OF REORGANIZATION HEREIN DESCRIBED AND ATTACHED AS EXHIBIT A, IS BEING SOUGHT FROM CREDITORS WHOSE CLAIMS AGAINST THE DEBTORS ARE IMPAIRED UNDER THE PLAN OF REORGANIZATION.  CREDITORS ENTITLED TO VOTE ON THE PLAN OF REORGANIZATION ARE URGED TO VOTE IN FAVOR OF THE PLAN AND TO RETURN THE BALLOT INCLUDED WITH THIS DISCLOSURE STATEMENT UPON COMPLETION IN THE ENVELOPE ADDRESSED TO HOOVER SLOVACEK LLP., ATTENTION: EDWARD L. ROTHBERG, GALLERIA TOWER II, 5051 WESTHEIMER, SUITE 1200, HOUSTON, TEXAS 77056, NOT LATER THAN , AT _:_. . _____.M. CENTRAL, TIME.

# Table of Contents

I.     INTRODUCTORY STATEMENT ................................................................ 4

II.    VOTING PROCEDURES ......................................................................... 6

III.   IMPAIRMENT OF CLAIMS ..................................................................... 7

IV.    NATURE AND HISTORY OF BUSINESS ................................................ 9

    A.   SOURCE OF INFORMATION AND ACCOUNTING METHOD ....................................... 9
    B.   GENERAL INFORMATION ABOUT THE DEBTOR ....................................................... 9
        1.   *The Debtor* ...................................................................................... 9
        2.   *Financial Difficulties and Restructuring* ........................................... 15
        3.   *Financial Situation as of Petition Date* ............................................. 16
        4.   *Ownership and Management* ............................................................. 16
        5.   *Significant Actions in Bankruptcy Case* ............................................ 16
    C.   CASE MANAGEMENT GOING FORWARD ................................................................ 17

V.     DESCRIPTION OF PLAN ....................................................................... 18

    A.   OVERALL STRUCTURE OF THE PLAN ..................................................................... 18
    B.   ADMINISTRATIVE EXPENSES AND PRIORITY TAX CLAIMS AND TIMING OF PAYMENT ....... 20
    C.   CLASSES OF PRIORITY, SECURED AND UNSECURED CLAIMS AND TREATMENT OF INTERESTS 20
    D.   MEANS OF EXECUTION OF PLAN: ....................................................................... 22
        1.   *VESTING OF PROPERTY OF THE ESTATE IN REORGANIZED DEBTOR* ..................... 22
        2.   *CONTINUATION OF BUSINESS OPERATIONS* ............................................... 22
        3.   *DIRECTORS AND OFFICERS OF REORGANIZED DEBTORS* ................................. 22
        4.   *SOURCE OF FUNDS FOR PAYMENTS DUE ON THE EFFECTIVE DATE.* .................... 22
    E.   BAR DATES. ................................................................................................ 22
        1.   *ADMINISTRATIVE CLAIMS BAR DATE.* ..................................................... 22
        2.   *UNSECURED CLAIMS BAR DATE* ............................................................ 23
        3.   *REJECTION DAMAGE CLAIM BAR DATE* .................................................... 23
    F.   SUMMARY OF FINANCIAL PROJECTIONS ................................................................ 23

VI.    LIQUIDATION ANALYSIS ..................................................................... 23

    A.   METHODOLOGY. ........................................................................................... 24
    B.   ANALYSIS. .................................................................................................. 24

VII.   RISKS POSED TO CREDITORS ............................................................. 25

VIII.  ALTERNATIVES .................................................................................. 25

    A.   CONVERSION TO CHAPTER 7 ............................................................................ 25
    B.   DISMISSAL .................................................................................................. 25
    C.   NO ASSURANCE OF EITHER .............................................................................. 26

IX.    CERTAIN FEDERAL INCOME TAX CONSEQUENCES .......................... 26

    A.   TAX CONSEQUENCES TO CREDITORS. ................................................................. 26
        1.   *Generally* ...................................................................................... 26

*2. Unsecured Claims* ..................................................................................................... *26*
   B.   Tax Consequences to the Debtor. ....................................................................... 26

**X.**      **PREFERENCES AND FRAUDULENT TRANSFERS** ................................................ **27**

**XI.**     **LITIGATION** ............................................................................................................. **27**

**XII.**    **MANAGEMENT OF THE REORGANIZED DEBTOR** ...................................... **27**
   A.   Officers of the Debtor ................................................................................... 28
   B.   Management Compensation ............................................................................. 28

**XIII.**   **ACCEPTANCE AND CONFIRMATION OF THE PLAN** .................................... **28**
   A.   Acceptance of the Plan ................................................................................... 28
   B.   Confirmation without Acceptance of All Impaired Classes ............................... 28
   C.   Other Requirements for Confirmation .............................................................. 29
      *1. Best Interest of Creditors* ......................................................................... *29*
      *2. Financial Feasibility* ................................................................................ *30*
   D.   Cram-Down - Confirmation Without Acceptance by All Impaired Classes ....... 30

**XIV.**   **CONCLUSION** ........................................................................................................ **31**

## DISCLOSURE STATEMENT

Dia-Den Ltd. ("Debtor" or "Dia-Den"), debtor and debtor-in-possession herein, submits this Disclosure Statement ("Disclosure Statement") under section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016 in Support of its Chapter 11 Plan of Reorganization to all of its known Creditors.

## I.        INTRODUCTORY STATEMENT

Debtor submits this Disclosure Statement under 11 U.S.C. § 1125 in support of its Chapter 11 Plan of Reorganization under Chapter 11 of the United States Bankruptcy in connection with its solicitation of acceptances of the Plan of Reorganization under Chapter 11 of the United States Bankruptcy Code filed by the Debtor (the "Plan"). A copy of the Plan is attached as Exhibit A for your review. All terms used in this Disclosure Statement but not otherwise defined herein have the meanings ascribed to such terms in the Plan.

The Debtor filed a petition under Chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Southern District of Texas, Houston Division, on May 8, 2015 and retained Edward L. Rothberg and Hoover Slovacek LLP as bankruptcy counsel. The Debtor has prepared this Disclosure Statement to disclose that information which, in its opinion, is material, important, and necessary to an evaluation of the Plan. Pursuant to the terms of the United States Bankruptcy Code, this Disclosure Statement must be presented to and approved by the Bankruptcy Court. Such approval is required by statute and does not constitute a judgment by the Court as to the desirability of the Plan or as to the value or suitability of any consideration offered thereby.

The material herein contained is intended solely for the use of known creditors and interest holders of the Debtor, and may not be relied upon for any purpose other than a determination by them of how to vote on the Plan. As to Contested Matters, Adversary Proceedings and other actions or threatened actions, the Disclosure Statement and exhibits shall not constitute or be construed as an admission of any fact or liability, stipulation or waiver, but rather as a statement made in settlement negotiations under Rule 408 of the Federal Rules of Evidence. This Disclosure Statement shall not be admissible in any non-bankruptcy proceeding nor shall it be construed as to be advice on the tax, securities or other legal effects of the plan as to the holders of claims against or equity interests in the Debtor or its affiliates.

To ensure compliance with Treasury department circular 230, each holder of a claim or interest is hereby notified that: (a) any discussion of U.S. Federal Tax issues in this disclosure statement is not intended or written to be relied upon, and cannot be relied upon, by any holder for the purpose of avoiding penalties that may be imposed upon a holder under the Tax Code; (b) such discussion is included hereby by the Debtor in connection with the promotion or marketing (within the meaning of Circular 230) by the Debtor of the transactions or matters addressed herein; and (c) each holder should seek advice based upon its particular circumstances from an independent tax advisor.

Certain of the materials contained in this Disclosure Statement are taken directly from other, readily accessible instruments or are digests of other instruments.  While the Debtor has made every effort to retain the meaning of such other instruments or the portions transposed, it urges that any reliance on the contents of such other instruments should depend on a thorough review of the instruments themselves.

No representations concerning the Debtor or the Plan are authorized other than those that are set forth in this Disclosure Statement.  Any representations or inducements made by any person to secure your vote which are other than those contained herein should not be relied upon, and such representations or inducements should be reported to counsel for the Debtor who shall deliver such information to the Bankruptcy Court.  Finally, all terms not otherwise defined in this Disclosure Statement shall have the meanings assigned to them under the Plan.

Creditors should read this Disclosure Statement in its entirety prior to voting on the Plan. No solicitation of votes on the Plan may be made, except pursuant to this Disclosure Statement and Section 1125 of the Bankruptcy Code.  No other party has been authorized to utilize any information concerning the Debtor or its affairs, other than the information contained in this Disclosure Statement, to solicit votes on the Plan.  Creditors and holders of equity interest should not rely on any information relating to the Debtor, other than that contained in this Disclosure Statement and the exhibits attached hereto.

**EXCEPT AS SET FORTH IN THIS DISCLOSURE STATEMENT AND THE ATTACHMENTS, NO REPRESENTATIONS CONCERNING THE DEBTOR, THE ASSETS, THE PAST OPERATIONS OF THE DEBTOR, OR THE PLAN ARE AUTHORIZED, NOR ARE ANY SUCH REPRESENTATIONS TO BE RELIED UPON IN ARRIVING AT A DECISION WITH RESPECT TO THE PLAN.   ANY REPRESENTATIONS MADE TO SECURE ACCEPTANCE OR REJECTION OF THE PLAN OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT SHOULD BE REPORTED TO COUNSEL FOR THE DEBTOR.**
**EXCEPT AS SPECIFICALLY NOTED, THERE HAS BEEN NO INDEPENDENT AUDIT OF THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT.  THE DEBTOR IS NOT ABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN IS WITHOUT ANY INACCURACY. THE FACTUAL INFORMATION REGARDING THE DEBTOR, INCLUDING THE ASSETS AND LIABILITIES OF THE DEBTOR, HAS BEEN DERIVED FROM NUMEROUS SOURCES, INCLUDING, BUT NOT LIMITED TO, DEBTOR'S BOOKS AND RECORDS, SCHEDULES AND DOCUMENTS SPECIFICALLY IDENTIFIED HEREIN.**
**THE DEBTOR ALSO COMPILED THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT FROM RECORDS AVAILABLE TO IT, INCLUDING, BUT NOT LIMITED TO, PLEADINGS AND REPORTS ON FILE WITH THE BANKRUPTCY COURT, LOAN AGREEMENTS AND BUSINESS RECORDS.**
**THE APPROVAL BY THE BANKRUPTCY COURT OF THE DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE PLAN OR A GUARANTY OF THE ACCURACY AND COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.**

**THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION, NOR HAS THE COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.**

**NEITHER THE DEBTOR NOR COUNSEL FOR THE DEBTOR CAN WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS WITHOUT INACCURACIES.  NEITHER THE DEBTOR NOR ITS COUNSEL HAS VERIFIED THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, ALTHOUGH THEY DO NOT HAVE ACTUAL KNOWLEDGE OF ANY INACCURACIES.**
**IF THE REQUISITE VOTE IS ACHIEVED FOR EACH CLASS OF IMPAIRED CLAIMS, THE PLAN IS SUBSEQUENTLY CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AGAINST THE DEBTOR (INCLUDING, WITHOUT LIMITATION, THOSE HOLDERS OF CLAIMS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN), WILL BE BOUND BY THE TERMS OF THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.**

## II.    VOTING PROCEDURES

Any creditor of the Debtor whose claim is IMPAIRED under the Plan is entitled to vote, if either (1) the claim has been scheduled by the Debtor and such claim is not scheduled as disputed, contingent or unliquidated, or (2) the creditor has filed a proof of claim on or before the last date set by the Bankruptcy Court for such filings, *provided, however*, any claim as to which an objection has been filed (and such objection is still pending) is not entitled to vote, unless the Bankruptcy Court temporarily allows the creditor to vote upon motion by the creditor.  Such motion must be heard and determined by the Bankruptcy Court prior to the date established by the Bankruptcy Court to confirm the Plan.  In addition, a creditor's vote may be disregarded if the Bankruptcy Court determines that the creditor's acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

Holders of impaired claims who are entitled to vote and fail to do so will not be counted as either accepting or rejecting the Plan.  Nevertheless, if the requisite vote is achieved for your class of impaired claims, you will be bound by the terms of the Plan.

A ballot to be used for voting to accept or reject the Plan is enclosed with this Disclosure Statement and mailed to creditors entitled to vote.  A creditor must (1) carefully review the ballot and the instructions thereon, (2) execute the ballot, and (3) return it to the address indicated thereon by the deadline to enable the ballot to be considered for voting proposes.

**THE DEADLINE FOR RETURNING YOUR BALLOT
IS_____, 2015
(THE "VOTING DEADLINE").**

After completion of the ballot, creditors should return the executed ballot in the self-

addressed envelope to:

**DIA-DEN LTD.**
**c/o EDWARD L. ROTHBERG / T. JOSH JUDD**
**HOOVER SLOVACEK LLP**
**GALLERIA TOWER II**
**5051 WESTHEIMER, SUITE 1200**
**HOUSTON, TX  77056**

**VOTING INFORMATION AND INSTRUCTION FOR COMPLETING THE BALLOT:**

**FOR YOUR VOTE TO BE COUNTED YOU MUST COMPLETE THE BALLOT, INDICATE ACCEPTANCE OR REJECTION OF THE PLAN IN THE BOXES INDICATED ON THE BALLOT AND SIGN AND RETURN THE BALLOT TO THE ADDRESS SET FORTH ON THE PRE-ADDRESSED ENVELOPE.  IF A BALLOT IS RECEIVED AFTER THE VOTING DEADLINE, IT WILL NOT BE COUNTED.**

**IF YOU HOLD CLAIMS IN MORE THAN ONE CLASS UNDER THE PLAN, YOU MAY RECEIVE MORE THAN ONE BALLOT.  EACH BALLOT YOU RECEIVE VOTES ONLY YOUR CLAIMS FOR THAT CLASS.  PLEASE COMPLETE AND RETURN EACH BALLOT YOU RECEIVE.  YOU MUST VOTE ALL OF YOUR CLAIMS WITHIN A SINGE CLASS UNDER THE PLAN TO EITHER ACCEPT OR REJECT THE PLAN.  ACCORDINGLY, A BALLOT (OR MULTIPLE BALLOTS WITH RESPECT TO MULTIPLE CLAIMS WITHIN A SINGLE CLASS) THAT PARTIALLY REJECTS AND PARTIALLY ACCEPTS THE PLAN WILL NOT BE COUNTED.**

**THE BALLOT IS FOR VOTING PURPOSES ONLY AND DOES NOT CONSTITUTE AND SHALL NOT BE DEEMED A PROOF OF CLAIM OR INTEREST OR AN ASSERTION OF A CLAIM.**

### III.   IMPAIRMENT OF CLAIMS

A class is "impaired" if the legal, equitable or contractual rights attaching to the claims or interest of that class are modified under a plan.  Modification for purposes of determining impairment however, does not include curing defaults and reinstating maturity or cash payment in full.  Classes of claims or interests that are not "impaired" under a plan are conclusively presumed to have accepted the plan and are thus not entitled to vote.  Classes of claims or interests receiving no distribution under a plan are conclusively presumed to have rejected the plan and thus are not entitled to vote.  Acceptances of the Plan are being solicited only from those persons who hold claims in an impaired class entitled to receive a distribution under the Plan.

Under Section 1124 of the Bankruptcy Code, a class of claims or interests is impaired under a plan, **unless**, with respect to each claim or interest of such class, the plan:

1.      Leaves unaltered the legal, equitable, and contractual rights of the holder of such claim or interest; or

2.      Notwithstanding any contractual provision or applicable law that entitles the holder of a claim or interest to receive accelerated payment of its claim or interest after the occurrence of a default:

>   (a) Cures any such default that occurred before or after the commencement of the case under the Bankruptcy Code, other than a default of a kind specified in Section 365(b)(2) of the Bankrupt Code;
>
>   (b) Reinstates the maturity of such claim or interest as it existed before the default;
>
>   (c) Compensates the holder of such claim or interest for damages incurred as a result of reasonable reliance on such contractual provision or applicable law; and
>
>   (d) Does not otherwise alter the legal, equitable or contractual rights to which such claim or equity interest entitles the holder of such claim or interest; or

3.      Provides that, on the Effective Date the holder of such claim or interest receives, on account of such claim or interest, cash, equal to:

>   (a) With respect to a claim, the allowed amount of such claim; or
>
>   (b) With respect to an interest, if applicable, the greater of:
>
>   >   (i) Any applicable fixed liquidation preference; or
>   >
>   >   (ii) Any fixed preference at which the Debtor, under the terms of the security, may redeem the security.

4.      In Article 5 of the Plan, the Debtor has identified the impaired classes of creditors under the Plan.  In the event there are questions regarding whether a person is in an impaired class, the person should assume that his or her claim is impaired and vote.  If the claim is determined to be impaired, the vote will be considered by the Bankruptcy Court.  The Class 2, 3 and 4 holders of claims of the Debtor are impaired under the Plan.

**IMPAIRED CREDITORS ANTICIPATED TO RECEIVE A DISTRIBUTION UNDER THE PLAN ARE BEING SOLICITED TO VOTE.   IF YOU HOLD AN ADMINISTRATIVE CLAIM OR UNIMPAIRED CLAIM, THE DEBTOR IS NOT SEEKING YOUR VOTE.**

## IV.   NATURE AND HISTORY OF BUSINESS

### A.   Source of Information and Accounting Method

The Debtor's books are currently maintained under the supervision of Dennis W. Abrahams and Charles Johnson. The Debtor is on the accrual method of accounting for recognizing revenue and expenses. The historical financial information contained in this disclosure statement as well as the bankruptcy schedules and statement of affairs was derived from the Debtor's books and records. **THE DEBTOR'S BOOKS HAVE NOT BEEN AUDITED BY AN INDEPENDENT PUBLIC ACCOUNTANT (OTHER THAN AS EXPRESSLY DESCRIBED HEREIN). NO ABSOLUTE REPRESENTATION IS MADE AS TO THE ACCURACY OF THE DEBTOR'S RECORDS. HOWEVER, THE DEBTOR HAS ATTEMPTED TO ACCURATELY REFLECT ITS BUSINESS OPERATIONS.**

### B.   General Information about the Debtor

1.   The Debtor

a.   Business Operation Model/Assets

The Debtor was organized on December 21, 2000 under the laws of the State of Texas. Dia-Den is a limited partnership that owns and leases a single tenant industrial facility with a total of 154,297 square feet of gross building area on 37.94 acres of land located at 24310 State Highway 249, Tomball, Harris County, Texas 77375 (the "Industrial Facility" or "Property").

In April 2014, the Debtor sold its Windmill Park facility for $2.8 million. The proceeds were used to retire two notes held by Wells Fargo and to pay down Wells Fargo's Second Lien Note (as described below). Currently, the only business of the Debtor is the ownership and leasing of the Industrial Facility.

PJJ Inc. is the general partner of the Debtor and manages the Debtor's affairs. Dennis W. Abrahams serves as the sole Director and President of PJJ Inc.

The Debtor leases the Industrial Facility (and all equipment) to Accelerated Production Systems, Inc., pursuant to a triple net lease (the "APS Lease). The monthly lease payment is $50,000 (or approximately$0.32 per square foot per month triple net), which is significantly below market rates. Wells Fargo was aware of the terms of the APS Lease when it was negotiated. On a triple net basis, the current monthly market rent per square foot in the submarket is between $0.60 and $0.69 per square foot. The APS Lease expires on March 31, 2018, with a five year renewal option provided that APS is not in default and provides the Debtor written notice of its intent at least nine (9) months prior to the expiration date of its intent to exercise the renewal option. The renewal rate is the higher of $65,000 per month or fair market rent, which shall be determined by an independent appraisal.

The Property consists of four (4) buildings with a total of 154,297 square feet of gross building area.  The buildings include three 5-ton bridge cranes, two 10-ton bridge cranes, three 20-ton bridge cranes and two 50-ton bridge cranes with 10-ton kickers.  The Property also includes a 1,200 square foot paint booth and a 1,200 square foot blast booth. Photos of the buildings follow.


Exterior view of building 1


Exterior view of building 2


Exterior view of building 3


Exterior view of building 4


Interior view of building 1 office area


Interior view of building 1 warehouse area


Interior view of building 2 office


Interior view of building 2 warehouse area


Interior view of building 3


View of detention pond



The Property consists of 37.940 acres with frontage access on a primary roadway and secondary access along a secondary neighborhood roadway. The Property operates on a water well and has a water treatment facility. The Property is not subject to zoning and therefore further development of the site is not restricted.

Certain strengths of the Industrial Facility are good access and visibility along a primary roadway, it is located in a strong submarket, it is leased to a strong credit tenant, and it has heavy lift cranes with an innovative paint and blast shop that is connected by rail to the main shop. The heavy lift cranes and paint/blast shops substantially increase the value of the Property and increase its marketability.

A November 6, 2014 appraisal of the Property valued the Industrial Facility (with all improvements and equipment) as follows:

Leased fee interest of Property:    $11,200,000[1]
Equipment (cranes and paint/blast booths):[2] $   758,165

TOTAL:    **$11,958,165**

As of the Petition date, the Debtor had approximately $53,882 cash on hand.

    b.   Liabilities

The Debtor's liabilities on the petition date are set forth as follows:

| Name | Amount | Comment |
|---|---|---|
| Harris County, et al. | $   158,000 | Estimated 2015 taxes. Paid by tenant per APS lease when due in January 2016. |
| Wells Fargo | $5,281,427.78 | First lien – Reimbursement Agreement from Bonds |
| Wells Fargo | $2,805,810 | Second lien note |
| Orsack Zidell & Roberston | $     4,295 | Accounting services |
| Charles L. Johnson | $     3,000 | Accounting/consulting services |
| Thorton Farish, Inc. | $        924 | Remarketing agent for bonds |
| Wells Fargo Corporate Trust Services | $     1,500 | Trustee fee related to bonds |

---

[1] The current below market lease of the Industrial Facility results in approximately $2,061,279 reduction of value. If the Industrial Facility were leased at market rate it is expected that the fair market value would approach $13.5 million. Even at its current appraised value it is higher than the last know appraisal from May 24, 2011, which value then appraised was $11,209,000; therefore, the below market lease did not negatively impact Wells Fargo from its it prior credit perspective.

[2] A description of the equipment is listed on Debtor's Schedule B on file with the court. Value listed is based upon cost less depreciation. Replacement cost of the equipment is substantially higher. Removal of the equipment from the warehouses would be difficult, if not impractical.

<u>Secured Liabilities</u>

In 2001, pursuant to a Trust Indenture (the "Indenture") with Regions Bank (the "Trustee"), the Gulf Coast Industrial Development Authority, a non-stock, nonprofit industrial development corporation existing under the laws of the State of Texas (the "Issuer") agreed to issue and sell up to $5,000,000 of Industrial Development Revenue Bonds Series 1997 (the "Bonds").

Ultimately, $3,280,000 from of the Bonds were used to fund a loan assumed by the Debtor. The First Supplemental Indenture of Trust required that the Debtor obtain an irrevocable letter of credit to secure payment of the Bonds. To that end, the Debtor obtained the required letter of credit from Bank One to secure repayment of the Bonds.

In 2007, pursuant to a new Trust Indenture (the "2007 Indenture"), Wells Fargo and the Issuer agreed to refund and retire the then existing $3,280,000 of outstanding Bonds (the "Refunded Bonds") and agreed to issue and sell an additional $2,000,000 of bonds for the purpose of the Debtor's construction and improvement of certain manufacturing facilities on the Property (the 2007 Bonds). Wells Fargo was appointed as the Trustee. The interest rate of the 2007 Bonds fluctuates and is determined by the Remarketing Agent as the rate of interest, which in the judgment of the Remarking Agent, would cause the 2007 Bonds to have a market value of as of the date of determination equal to the principal amount thereof, taking into account prevailing market conditions. Due to the historically low interest rates, the fluctuating interest rate on the 2007 Bonds has been below than ½ of 1% for the past several years.

In addition, pursuant to the 2007 Indenture the Debtor obtained the required letter of credit from Wells Fargo to secure payment of the 2007 Bonds. The Debtor and Wells Fargo entered into a reimbursement agreement that required the Debtor to reimburse any amount paid by Wells Fargo under the letter of credit.

At that same time, Wells Fargo sought to replace Bank One as the sole source of real estate, capital equipment and operating loans for the Debtor, and its affiliated operating companies). The Debtor and its affiliates maintained several lien notes with Wells Fargo, all of which except the Second Lien Note were ultimately retired. Because Wells Fargo was the Debtor's secondary lender (and a 39% shareholder of a former operating affiliate of the Debtor), Wells Fargo was intimately familiar with the Debtor's business operations and financial condition.

On or about August 25, 2014, Wells Fargo notified the 2007 Bond Trustee (itself) that it was not renewing the letter of credit securing repayment of the 2007 Bonds, even though no default existed and Dia-Den had the ability to redeem the 2007 Bonds and/or retire the Second Lien Note by an additional $12,000 per month. This action by Wells Fargo created a default and obligated Wells Fargo to tender the full amount of the 2007 Bonds to the Trustee (itself) for payment to the bondholders. Upon information and belief,

Wells Fargo, Trustee actually purchased the 2007 Bonds from the bondholders for its own account.  Had Wells Fargo simply accepted a generous fee for renewing the letter of credit, there would have been no default at all and the Debtor would have continued making payments due on the low rate 2007 Bonds  and on the Second Lien Note.  As a result, on October 1, 2014, pursuant to the Amended and Restated Reimbursement Agreement between Debtor and Well Fargo, Debtor submitted a Notice of Intent to Borrow in the full amount of $5,281,427.78 (the "Tender Drawing"), which notice indicated that Debtor would endeavor to borrow the amount drawn against the letter of credit from another source within 30 days and subsequently repay Wells Fargo.  The Debtor was unable to obtain another loan from another source and subsequently fell into default under the Amended and Restated Reimbursement Agreement which caused a cross-default on the Second Lien Note.

On or about December 19, 2014, the Debtor and Wells Fargo entered into a forbearance agreement that provided for (i) monthly payments to Wells Fargo in the amount $45,000[3] and (2) that the Debtor retire an equipment loan owed to Wells Fargo Equipment Finance, Inc.  The Debtor successfully retired the $154,000 equipment loan and made all the monthly payments required under the forbearance agreement. The forbearance agreement expired on April 28, 2015.

The economic effect of Wells Fargo revoking the letter of credit was significant.  It allowed Wells Fargo to demand payment of a substantially higher interest rate from the Debtor (rather than the Debtor continuing to pay the required interest payments on the 2007 Bonds).   There is a substantial interest rate arbitrage available to Wells Fargo for purchasing the Bonds.  Regardless, Wells Fargo asserts it is entitled to the default interest under the Reimbursement Agreement and Second Lien Note.

By way of example, the following is summary of the Debtor's monthly average debt service and income prior to Wells Fargo revoking the letter of credit on the 2007 Bonds and debt service after Wells Fargo declared default:

|  | Prior to WF initiating default on 2007 Bonds | After WF initiates default of 2007 Bonds and cross-default on Second Lien Note |
|---|---|---|
| Rental Income | $ 50,000 | $50,000 |
| WF equipment note | ($10,000) | Forced one-time payment of ($154,000) to retire debt. |
| 2007 Bonds | ($11,000) | ($45,000) |
| Second Lien Note | ($13,398) | Combined with $45,000 payment |
|  |  |  |
| TOTAL  (term financing) | ($34,398) | ($45,000) |
|  |  |  |

---

[3] The $45,000 monthly payments required under the forbearance agreement is $21,000 more than was required to service the 2007 Bonds and Second Lien Note (if Wells Fargo had not revoked the letter of credit).

| Net Cash Flow (before other expenses) | **$15,602** | **$  5,000** |

Second Lien Note.  On April 29, 2010, Debtor executed and delivered to Wells Fargo a promissory note in the original principal amount of $3,500,000, as subsequently modified by the parties (the "Second Lien Note").  The Second Lien Note is secured by a second deed of trust on the Property.  The current balance of the Second Lien Note is $2,805,810

Priority Tax Claims.  The Debtor is treated as a pass through entity for income tax purposes and, as such, is not subject to income taxes. The Debtor's federal tax status as a pass through entity is based upon its legal status as a partnership.  Accordingly, the Debtor has no federal income tax liability.  For tax year 2014, the Debtor timely filed form 7004, Application for Automatic Extension to File Returns with the Internal Revenue Service.  No taxes are owed by the Debtor for 2014.

General Unsecured Claims.  The Debtor scheduled approximately $10,000 in general unsecured claims.  To obtain greater detail, please see the liabilities listed above.

Administrative Claims Analysis

The only administrative expenses will be U.S. Trustee fees and accrued professional fees.

As of the Petition Date, the balance of Hoover Slovacek LLP' pre-petition retainer was $51,571.71.  After applying the balance of the pre-petition retainer, it is not expected that additional professional fees will be incurred for the Debtor.

In summary, the Debtor will have sufficient funds to satisfy ordinary course post-petition payables and attorneys fees.  Based on the foregoing, the Debtor believes that it will have sufficient funds to pay all administrative expense claims which will come due on the Effective Date.

2.    Financial Difficulties and Restructuring

Prior to Wells Fargo revoking the letter of credit securing repayment of the 2007 Bonds, the Debtor had net cash flow of $26,602 a month after debt service.  When Wells Fargo created the event of default on the 2007 Bonds, Wells Fargo invoked the cross-default provisions of the Second Lien Note and demanded immediate payment of over $8,000,000.  As explained above, the forbearance agreement between the Debtor and Wells Fargo expired on April 28, 2015.  The Debtor and Wells Fargo were unable to reach a final agreement on an extension or restructuring of the existing debt, thereby precipitating this bankruptcy. Accordingly, the Debtor filed this bankruptcy proceeding to restructure its debt and reorganize its operations.

The following is a summary of the Gross Income for the Debtor for the years leading up to the bankruptcy filing:

| Year | Gross Income |
|------|--------------|
| 2013 | $910,328 |
| 2014 | $614,688 + extraordinary gain on sale of asset of $2,466,215.75 |
| 2015 (through 5/05/15) | $250,000 |

3.      Financial Situation as of Petition Date

As mentioned above, the Debtor's secured indebtedness to Wells Fargo consists of two secured claims totaling approximately $8.2 million.  Wells Fargo claims a lien on virtually all of Debtor's assets.  The Debtor also has reported general unsecured debt on its schedules of approximately $10,000.  The unsecured debt obligations are owed to 4 creditors. The Debtor has no employees.

4.      Ownership and Management

c.      <u>General Overview & Management</u>

Dennis W. Abrahams oversees the Debtor's day to day operations and is President of the Debtor's general partner.  At present, Mr. Abrahams is not being paid for management of the Debtor's business affairs.  Mr. Abrahams is authorized to prosecute the bankruptcy case.  The Debtor expects the same management to remain in place after Plan confirmation.

d.      <u>Capital Structure</u>

The Debtor is a Texas limited partnership.   The Debtor's equity holders are as follows:

| Name | Percentage Interest | Type |
|------|---------------------|------|
| Dennis W. Abrahams | 49.5% | limited partner |
| Dianne V. Abrahams | 49.5% | limited partner |
| PJJ Inc. | 1% | general partner |

5.      Significant Actions in Bankruptcy Case

e.      <u>Voluntary Petition filing</u>

The Debtor filed for Chapter 11 relief on May 8, 2015.  The Debtor continues to operate as a debtor-in-possession subject to the supervision of the Bankruptcy Court and in accordance with the Bankruptcy Code and is authorized to operate its business and manage its property in the ordinary course, with transactions outside of the ordinary course of business requiring

Bankruptcy Court approval.  An immediate effect of the filing of the Debtor's bankruptcy petition is the imposition of the automatic stay under the Bankruptcy Code which, with limited exceptions, enjoins the commencement or continuation of all collection efforts by creditors, the enforcement of Liens against property of the Debtor, and the continuation of litigation against the Debtor. The relief provides the Debtor with the "breathing room" necessary to reorganize its business and prevents creditors from obtaining an unfair recovery advantage while the Chapter 11 Case is ongoing.

f. <u>Administration – "First Day" Motions</u>

The day of filing the Chapter 11 Case, the Debtor filed several applications and motions seeking relief by virtue of so-called "first day motions."  First day motions are intended to facilitate the transition between a debtor's pre-petition and post-petition business operations by approving certain regular business practices that may not be specifically authorized under the Bankruptcy Code or as to which the Bankruptcy Code requires prior approval by the bankruptcy court.  The first day orders the Debtor obtained in this Chapter 11 Case, which is typical of orders entered in business reorganization cases across the country, authorize, among other things:

*Motion for Use of Cash Collateral*: The filing of a bankruptcy proceeding prohibits the debtor from using cash held in its own accounts to the extent that the cash constitutes collateral, unless the debtor obtains court permission or the lender consents.  Thus, contemporaneously with the bankruptcy the, the Debtor sought to use cash proceeds of rents generated from its business to continue operations and to pay interest at the non-default rate to Wells Fargo.  The cash collateral was allegedly encumbered by liens of Wells Fargo. Without Cash Collateral, the Debtor could not have continued operations.  The Debtor expects to continue to make monthly payments to Wells Fargo until a Plan is confirmed.

g. <u>Employment of Professional Persons</u>

The Debtor is seeking to be represented in this Chapter 11 proceeding by Edward L. Rothberg and the law firm of Hoover Slovacek LLP and has filed an Application to Employ Mr. Rothberg contemporaneously with its bankruptcy filing.

h. <u>Other Relevant Pleadings/Actions</u>

<u>Expedited Motion to Reduce Time for Non-Governmental Entities to File Proofs of Claim.</u>  By this Motion, the Debtor is seeking to reduce the time for filing proofs of claim to June 8, 2015.  The Debtor will provide separate notice to all creditors and parties an interest of the deadline to file proofs of claims in this case.

C. **Case Management Going Forward**

1. PLAN NEGOTIATIONS

Prior to filing Chapter 11, the Debtor pursued alternative financing and potential sales. Potential lenders made offers to refinance the debt but such offers were not acceptable to Wells Fargo. The Debtor filed its Plan and this Disclosure Statement on the Petition Date. The Debtor seeks to proceed through Chapter 11 bankruptcy on an expedited basis.

2. ASSUMPTION AND REJECTION

The bankruptcy law allows the Debtor to assume or reject any pending lease agreements or executory contracts that exist on the date of the order for relief. Additionally, the law provides that the Debtor can assign its interest in lease agreements and executory contracts provided they cure all defaults and provide adequate assurance that the assignee will comply with the terms of the lease or contract. Executory contract and lease assumption and rejection are treated in the Plan. Any contract or lease not specifically assumed in the Plan, or by prior court order, is deemed rejected. The Debtor is assuming the lease with the current tenant of the Industrial Facility.

## V.    DESCRIPTION OF PLAN

### SUMMARY OF THE PLAN OF REORGANIZATION

**THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE AND IMPLEMENTATION OF THE PLAN AND THE CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, WHICH ACCOMPANIES THIS DISCLOSURE STATEMENT, AND TO THE EXHIBITS ATTACHED THERETO. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN DOCUMENTS REFERRED TO THEREIN. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN, AND REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS. THE PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN WILL CONTROL THE TREATMENT OF CLAIMS AGAINST, AND INTERESTS IN, THE DEBTOR UNDER THE PLAN AND WILL, UPON THE EFFECTIVE DATE, BE BINDING UPON HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, THE DEBTOR, THE REORGANIZED DEBTOR, AND OTHER PARTIES IN INTEREST. IN THE EVENT OF ANY CONFLICT BETWEEN THIS DISCLOSURE STATEMENT AND THE PLAN OR ANY OTHER OPERATIVE DOCUMENT, THE TERMS OF THE PLAN AND/OR SUCH OTHER OPERATIVE DOCUMENT WILL CONTROL.**

A.    **Overall Structure of the Plan**

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under Chapter 11, a debtor is authorized to reorganize its business for the benefit of its creditors

and equity holders.  Upon the filing of a petition for relief under Chapter 11, Section 362 of the Bankruptcy Code provides for an automatic stay of substantially all acts and proceedings against the debtor and its property, including all attempts to collect claims or enforce liens that arose prior to the commencement of the Chapter 11 Case.

The consummation of a plan of reorganization is the principal objective of a Chapter 11 case.  A plan of reorganization sets forth the means for satisfying claims against and interests in a debtor.  Confirmation of a plan of reorganization by the Bankruptcy Court makes the plan binding upon the debtor, any issuer of securities under the plan, any person acquiring property under the plan, and any creditor of, or equity security holder in the debtor, whether or not such creditor or equity security holder (i) is impaired under or has accepted the plan or (ii) receives or retains any property under the plan.  Subject to certain limited exceptions, and other than as provided in the plan itself or the confirmation order, the confirmation order discharges the debtor from any debt that arose prior to the date of confirmation of the plan and substitutes for such debt the obligations specified under the confirmed plan, and terminates all rights and interests of equity security holders.

The Plan should be read carefully and independently of this Disclosure Statement.  The following analysis of the Plan is intended to provide a context for understanding the remainder of this Disclosure Statement and to assist in an understanding of the Plan and the proposed treatment of the Creditors.

The Debtor expects to implement its plan and continue in its business restructuring which should provide growth and full compliance with the plan.  The Debtor has a strong core business and intends to reorganize around that business, with the expectation that its revenues will substantially improve when it can re-lease the property at market rates (beginning in April 2018).

The terms of the Debtor's Plan are based upon, among other things, the Debtor's assessment of its ability to achieve the goals of its business plan, make the distributions contemplated under the Plan, and pay its continuing obligations in the ordinary course of business.  Under the Plan, Claims against and Interests in the Debtor are divided into Classes according to their relative seniority and other criteria.

A copy of the Plan is attached as Exhibit A.  Generally, If the Plan is confirmed by the Bankruptcy Court and consummated, (1) Allowed Administrative Claims and Priority Non-Tax Claims will be paid in cash in full; (2) Allowed Ad Valorem Claims of Taxing Authorities will be paid in full in cash when they are due (by the tenant); (3) Allowed Secured Claims of the Debtor's lender will be paid by delivery of secured first lien promissory note from the Reorganized Debtor for $8,072,237[4], with  interest at the prime rate plus 1.5%; (4) Allowed Unsecured Claims will be paid in full without interest in six equal monthly installments, beginning on Effective Date or the date that such claims become Allowed Claims; and (5) the current equity holders will maintain their equity interest in the Reorganized Debtor.

---

[4] The exact claim amount will be determined at Plan confirmation hearing.

B.      **Administrative Expenses and Priority Tax Claims and Timing of Payment**

The Holders of Administrative Expense Claims against the estate and Tax Claims are treated as generally described below.

Payment of Administrative Claims.  Each Holder of an unpaid Allowed Administrative Claim shall be paid in Cash in full on the later of thirty (30) days after the Effective Date or the date such Claim becomes an Allowed Administrative Claim, unless the Holder of such Claim agrees to a different treatment. All payments to professionals for actual, necessary services and costs advanced in behalf of the bankruptcy up until the Confirmation Date shall be pursuant to Bankruptcy Court order and subject to the restrictions of 11 U.S.C. §330. Professional fees incurred for services rendered and costs advanced subsequent to the Effective Date shall be the liability of the Reorganized Debtor.  It is expected that the professional fees and expenses owed to Hoover Slovacek will not exceed the $51,571.71 pre-petition retainer.

Payment of Non-Tax Priority Claims.  Each Holder of an unpaid Allowed Non-Tax Priority Claim, if any, shall be paid in Cash in full on the later of thirty (30) days after the Effective Date or the date such Claim becomes an Allowed Non-Tax Priority Claim, unless the Holder of such Claim agrees to a different treatment.  No non-tax priority claims are expected.

C.      **Classes of Priority, Secured and Unsecured Claims and Treatment of Interests**

The Classes of Claims against and Interests in the Debtors created under the Plan, the treatment of those Classes under the Plan, and the other property to be distributed under the Plan, are generally described below.

**Class 1. Allowed Secured Claim of Taxing Authorities.**

Class 1 consists of the Allowed Secured Claims of Ad Valorem taxing authorities for the year 2015 secured by a lien on all of the Debtor's assets.

Treatment:  The APS Lease is a triple net lease and the tenant is responsible for payment of all property taxes on the Industrial Facility. The Allowed Secured Class 1 Claims shall be paid in cash in full without interest or penalty by the Debtor's tenant when they are due.  The Allowed Secured Class 1 Claims Holders shall retain their liens until such time as they are paid in full.  Harris County shall retain all liens it currently holds for the 2015 tax year on any property of the Debtor until it receives payment in full of all taxes.   The Class 1 claim will be timely paid without the necessity of the filing of administrative expense claims or requests for payment, and if not so timely paid, will be

subject to state court collection procedures without the necessity of further recourse to the Bankruptcy Court.  The Class 1 Claims are unimpaired.

**Class 2. Allowed Secured Claims of Wells Fargo.**

Class 2 consists of the Allowed Secured Claims of Wells Fargo secured by a lien on substantially all of the Debtor's assets.

Treatment:  The holder of the Class 2 Claim shall have an Allowed Secured Claim in the amount of $8,197,380.19[5] as of the Effective Date.

New Loan Documents: The Reorganized Debtor shall on the Effective Date execute a new Note to reflect the balance of Wells Fargo Allowed Claim (the "WF New Note"). The terms of the WF New Note shall provide that interest will accrue at prime rate, plus 1.5%, with equal monthly payments of principal and interest based upon a 30 year amortization.  The WF New Note will mature in five (5) years from the Effective Date. The WF New Note will be secured by a first lien deed of trust on the Industrial Facility and related security agreements in substantially the same form as the pre-petition loan documents.   The monthly payments will be approximately $42,806 (and will be specifically identified in the Confirmation Order).  The Debtor shall be obligated under the WF New Note to begin payments on the fifth day of the first month following the Effective Date.  There will be no pre-payment penalty under the WF New Note.  The Class 2 Claims are impaired.

**Class 3.  Allowed Unsecured Claims**

Class 3 consists of the Allowed Unsecured Claims of non-insiders.

Treatment:  The Holders of Allowed Unsecured Class 3 Claims shall be paid in full without interest in equal monthly installments over six months from the Effective Date or the date such Claims become Allowed Claims.  Payments will begin on the Effective Date.  The Class 3 Claims are impaired.

**Class 4.  Allowed Interests of Equity Holders.**

Class 4 consists of the Allowed Equity Interests in the Debtor.

---

[5] The exact amount of the Wells Fargo Allowed Claim shall be established at the plan confirmation hearing and identified in the Order Confirming Plan.

Treatment: Holders of Equity Interests shall retain their interests in the Reorganized Debtor but shall receive no distributions until a new lease entered into for the Industrial Facility at the then market rate (but in no event less than $65,000 per month, triple net). Class 4 is impaired.


D.    **Means of Execution of Plan:**

1.   VESTING OF PROPERTY OF THE ESTATE IN REORGANIZED DEBTOR. On the Effective Date of the Plan, all property of the Debtor and of its Estate shall vest in the Reorganized Debtor free and clear of liens, claims and encumbrances, except as otherwise provided by the terms of this Plan, including but not limited the Lender's retention of its liens as provided for in the Plan.

2.   CONTINUATION OF BUSINESS OPERATIONS. From and after the Effective Date of the Plan, the Reorganized Debtor shall be authorized to continue its normal business operations and enter into such transactions as it deems advisable, free of any restriction or limitation imposed under any provision of the Bankruptcy Code, except to the extent otherwise provided in the Plan. The cash flow of the operations shall be used to fund payments required by the Plan.

3.   DIRECTORS AND OFFICERS OF REORGANIZED DEBTORS. Dennis W. Abrahams will continue to serve as the President of PJJ Inc., the Debtor's general partner, from and after the Effective Date of the Plan. Except for reimbursement of actual expenses, Mr. Abrahams will not receive any distributions/payments from the Debtor until the Class 1, 2, and 3 Claims are paid in full.

4.   SOURCE OF FUNDS FOR PAYMENTS DUE ON THE EFFECTIVE DATE. Cash on hand and collection of rents from the APS Lease will be used to pay Administrative and other Claims as required by the Plan.


E.    **Bar Dates.**

1.   ADMINISTRATIVE CLAIMS BAR DATE. Any Holder of an Administrative Claim (including any cure Claims for executory contracts or leases that are assumed pursuant to this Plan, including Lease Claims) against the Debtor, except for administrative expenses incurred in the ordinary course of operating the Debtor's business, must file an application for payment of such Administrative Claim on or within thirty (30) days after entry of the Confirmation Order with actual service upon counsel for the Debtor, otherwise such Holder's Administrative Claim will be forever barred and extinguished and such Holder shall, with respect to any such Administrative Claim, be entitled to no distribution and no further notices. The Debtor shall pay pre-confirmation quarterly U.S. Trustee fees in full in Cash within thirty (30) days after the Effective Date. U.S. Trustee fees which accrue after confirmation shall be paid by the Reorganized Debtor

until the case is closed or converted.  The Debtor shall file with the Court and serve on the United States Trustee a monthly financial report for each quarter (or portion thereof) that the case remains open in a format prescribed by the United States Trustee.  It is not necessary for the U.S. Trustee to file a proof of claim.

2.  UNSECURED CLAIMS BAR DATE.  The deadline for filing a proof of claim for an unsecured claim of a non-governmental entity (other than a claim for damages stemming from the rejection of an executory contract or lease) is _____, 2015.  The Debtor is requesting that the Court shorten the bar date for non-governmental agencies to file proofs of claim to June 8, 2015.

3.  REJECTION DAMAGE CLAIM BAR DATE.  An Unsecured Claim arising from the rejection of an executory contract or unexpired lease must be filed no later than 20 days after the Effective Date of the Plan.

F.     **Summary of Financial Projections**

Attached hereto as Exhibit B are detailed financial projections prepared by management. The projections include the monthly forecast results for the balance of 2015 through 2019, and annual forecast for 2015 through 2019. The statements include projected cash flow forecasts and assumptions. The projections are conservative and establish that the Reorganized Debtor will be able to make the payments provided for in the Plan.

The APS Lease expires on March 31, 2018, with a five year renewal option that must be exercised by July 31, 2017.  In the event that APS does not renew, the Debtor expects a maximum marketing time of 12 months to secure a new tenant at a market rate.  Accordingly, the projections include a three month period of April, May and June 2018 without income to account for any potential delay in securing a new tenant.  Regardless, the Debtor will have sufficient cash reserves to make all debt service payments.

## VI.     LIQUIDATION ANALYSIS

Section 1129 of the Bankruptcy Code provides that the Court may confirm a plan of reorganization only if certain requirements are met.  One of these requirements is that each non-accepting holder of an allowed Claim or interest must receive or retain under the Plan, on account of such Claim or interest, property as of the Effective Date of the Plan at least equal to the value of such holder would receive if the Debtor was liquidated under Chapter 7 of the Bankruptcy Code on the Effective Date.

For the purposes of the following discussion, it is assumed that a Chapter 7 trustee would seek to maximize the value of the estate by attempting to sell the Property.  However, the Debtor believes that the circumstances surrounding liquidation under Chapter 7 would inevitably lead to selling conditions which would substantially detract from the total value returned to the estate. The following are some, but not all, of the deleterious consequences that the Debtor believes would result from Chapter 7 liquidation:

- Substantial Chapter 7 administrative costs relating to professional fees, management fees, broker commissions, sales commissions and other associated expenses would necessarily be incurred.

- The sale of the Debtor's assets and business under the time pressure and adverse publicity attendant to Chapter 7 liquidation would create a difficult selling environment and would result in a transaction consummated at a substantial discount to going-concern value. Further, US finance markets are currently distressed and make an estimation (or prediction) of the liquidation value of the Property speculative.

- Based on the discussions with the Lender, if the case is converted to a case under Chapter 7 of the Bankruptcy Code, Lender will likely foreclose on all of the assets, leaving a "no asset case."  Under this scenario, only Lender and the holders of ad valorem taxing authorities will receive a distribution and all other classes of claimants (including administrative claimants) will not recover on their Claims. The Debtor believes that this would be the likely result if the case is converted to Chapter 7.

Taking such matters into consideration, the Debtor has prepared the following liquidation analysis such that the holders of non-priority general unsecured claims could expect a dividend of zero.  Furthermore, the Debtor expects that the process of winding down the Debtor's affairs, objecting to claims and making dividends would likely take nine to twelve months.

A.    **Methodology.**

The starting point in determining the amount which members of each impaired class of unsecured claims and interests would receive in a Chapter 7 case is to estimate the dollar amount that would be generated from the liquidation of the Debtor (the "Liquidation Proceeds"). The Liquidation Proceeds of the Debtor would consist of the proceeds from the sale of the Property, augmented by the cash held by the Debtors.  The present value of the distribution from the Liquidation Proceeds is then compared with the present value offered to each of the classes of unsecured claims and interests of each such class.

B.    **Analysis.**

A Liquidation Analysis reflecting the liquidation value of the Debtor's assets and the corresponding return to unsecured creditors in the event of liquidation is attached hereto as Exhibit "C".   The return to unsecured creditors is 0% because the assets have a liquidation value of approximately $7.9 million and are secured by liens of approximately $8.1 million owed to the Wells Fargo.  Thus, if this case was converted to Chapter 7, the General Unsecured Creditors would not receive a distribution on their claim.

However, under the proposed Plan, the Class 2 Secured Claim and the Class 3 General Unsecured Creditors are scheduled to have their Allowed Claims paid in full as set forth above. Thus, the total value of the proposed distribution to Creditors exceeds the amount that can

reasonably be expected in liquidation.

# VII.   RISKS POSED TO CREDITORS

The principal risk to the creditors is that the Plan will not be confirmed.   Absent confirmation of the Plan, Wells Fargo may obtain stay relief and unsecured creditors would not receive any distribution on account of their Claims.

# VIII.   ALTERNATIVES

Although the Disclosure Statement is intended to provide information to assist creditors in making a judgment on whether to vote for or against the Plan, and although creditors are not being offered through that vote an opportunity to express an opinion concerning alternatives to the Plan, a brief discussion of alternatives to the Plan may be useful.   These alternatives include conversion to a Chapter 7 or dismissal of the proceedings.   The Debtor of course, believes the proposed Plan to be in the best interests of creditors.    The Debtor assesses the alternatives as follows:

A.   **Conversion to Chapter 7**

The first alternative would be to convert the Chapter 11 case to a Chapter 7 liquidating bankruptcy. If this occurred, the Bankruptcy Court will appoint a trustee to liquidate the Debtor's assets for the benefit of its creditors.   The costs associated with a trustee would then be added to the additional tier of administrative expenses entitled to priority over general unsecured claims upon conversion.   Such administrative expenses include the Chapter 7 Trustee's commissions, as well as fees for professionals retained by the Chapter 7 Trustee to assist in the liquidation. The Trustee's commissions are based on disbursements to creditors.   The Trustee receives 25% of the first $5,000, 10% of the next $45,000, 5% of the next $950,000 and 3% on all amount disbursed in excess of $1 million.

In a Chapter 7 case, the secured lender would lift the stay and foreclose on the Debtor's assets, and unsecured creditors would receive no distribution on account of their claims.

B.   **Dismissal**

Dismissal of the proceeding would likely result in the Debtor defending debt-collection litigation and numerous new lawsuits to collect debts.   The Secured Lender would foreclose on substantially all of the Debtor's assets, halting the Debtor's operations.   Even if there were unencumbered assets, the creditors who receive quick judgments will be able to execute and recover their claims leaving nothing for the remaining creditors.

C.    **No Assurance of Either**

      There are other possibilities which are less likely, such as a competing plan proposed by a different party.  The Debtor has attempted to set forth the reasonable alternatives to the proposed Plan. However, the Debtor must caution creditors that a vote must be for or against the Plan. The vote on the Plan does not include a vote on alternatives to the Plan.  There is no assurance what course the proceedings will take if the Plan fails acceptance.

## IX.    CERTAIN FEDERAL INCOME TAX CONSEQUENCES

A.    **Tax Consequences to Creditors.**

      **1. Generally**

      The tax consequence to any particular creditor may vary depending on their own circumstances and they should consult with their own tax professional for advice regarding the impact on them of their acceptance or rejection of the plan.

      **2. Unsecured Claims**

      Holders of Class 3 Unsecured Claims will receive distributions from the Debtor.  A Class 3 Claimholder should either be treated as (i) recognizing ordinary income in an amount equal to cash received and recognizing a loss in an amount equal to the tax basis in the Claim or (ii) recognizing a loss equal to the difference between the amount of cash received and their tax basis in their Claim.

      A Claimholder's tax basis in a Claim should generally equal the amount included in income as a result of the provision of goods or services to the Debtor, except to the extent that a bad debt loss had previously been claimed. The gain or loss with respect to the Claim should be ordinary to the extent that it arose in the ordinary course of trade or business for services rendered or from the sale of inventory to the Debtor.

**DUE TO THE COMPLEX NATURE OF APPLICABLE TAX LAWS, CLAIMANTS SHOULD CONSULT WITH THEIR TAX PROFESSIONAL CONCERNING COMPLIANCE WITH AND THE AFFECT OF BOTH STATE AND FEDERAL TAX LAWS ON THEIR INTEREST BEFORE THEY CAST A BALLOT TO ACCEPT OR REJECT THE PLAN.**
**THE ACCOUNTANTS, ATTORNEYS, AND THE MANAGEMENT OF THE DEBTOR MAKE NO REPRESENTATIONS HEREIN CONCERNING THE IMPACT OF THE TAX LAW ON ANY INDIVIDUAL TREATED UNDER THE PLAN.**

B.    **Tax Consequences to the Debtor.**

      The Debtor is treated as a pass through entity for income tax purposes and, as such, is not

subject to income taxes.  Rather, all items of taxable income, deductions and tax credits are passed through to and are reported by its equity holders on their respective income tax returns. The Debtor's federal tax status as a pass through entity is based upon its legal status as a partnership.  Accordingly, the Debtor is not required to take any tax positions in order to qualify as a pass-through entity.

## X.    PREFERENCES AND FRAUDULENT TRANSFERS

Under the Bankruptcy Code and Texas State Law, the bankruptcy estate may sue to recover assets (or their value) that were transferred by "voidable transfers", which includes assets transferred:

    (A)    in fraud of Creditors,

    (B)    in constructive fraud of Creditors – because the asset was transferred without sufficient consideration while the Debtor was insolvent,

    (C)    as a preferential transfer - a payment before bankruptcy outside the ordinary course that allows a creditor to receive more than it would receive in liquidation, or

    (D)    as an unauthorized post-bankruptcy transfer by the Debtor outside of the ordinary course.

The Debtor does not believes there are certain transfers voidable under Section 550, 547, 548, 544, or similar provision of the Bankruptcy Code because the Debtor was solvent.

All post-bankruptcy payments have been in the ordinary course, or otherwise authorized by the Court.  Accordingly, the Debtor does not believe that any transfers are avoidable under Section 549 of the Bankruptcy Code.  On the basis of this analysis, the Plan releases all such Section 549 causes of action against all parties.

If the Plan is not confirmed and a liquidating trustee or Chapter 7 trustee is appointed, it is possible that the trustee's analysis will differ from that of the Debtor and that other avoidance actions will be commenced against other Creditors of the estate or insiders.

## XI.    LITIGATION

No claim of environmental liability has been made, and no such claims are known or expected.  The Debtor is not a party to any litigation.

## XII.    MANAGEMENT OF THE REORGANIZED DEBTOR

A.       **Officers of the Debtor**

Dennis W. Abrahams is the President and sole Director of the Debtor's general partner. Current management will remain in place for the Reorganized Debtor.

B.       **Management Compensation**

Currently, Mr. Abrahams receives no compensation.  Mr. Abrahams will not receive any distributions from the Debtor until a new lease is entered into for the Industrial Facility at the then market rate (but in no event less than $65,000 a month, triple net).

## XIII.   ACCEPTANCE AND CONFIRMATION OF THE PLAN

A.       **Acceptance of the Plan**

Confirmation of a Plan under Chapter 11 requires, among other things, that at least one class of creditors or claimants, such as the secured or unsecured creditors in this case, vote in favor of the Plan.   This vote is calculated by only counting those creditors who actually send in a ballot on time.  If two thirds in total dollar amount and a majority in number of claims actually voting in a class approve the Plan, that class of creditors is considered an accepting class.  If the vote is insufficient, the Court can still confirm the Plan, but only upon being provided additional proof regarding the ultimate fairness of the Plan to the creditors.  The Debtor believes that the unsecured creditors will support the Plan when they consider the fact that the secured and priority creditors will receive the majority of all of the assets of the Debtor in the event the reorganization is unsuccessful.

The proponent of a Plan also must meet all other applicable requirements of Section 1129(a) of the Bankruptcy code (except Section 1129(a)(8), if the proponent proposes to seek confirmation of a Plan under Section 1129(b) of the Bankruptcy Code).   These other requirements include, among other things, that the Plan comply with the applicable provisions of Title 11 and other applicable law, that the Plan be proposed in good faith, and that at least one impaired class of creditors vote to accept the Plan.  The Debtor believes that the Plan satisfies all other applicable requirements of Section 1129(a) of the Bankruptcy Code.   A copy of the proposed form of ballot to be used for voting on the Plan is attached hereto as Exhibit "D."

B.       **Confirmation without Acceptance of All Impaired Classes**

The Bankruptcy Court may confirm a plan even if not all impaired classes accept the Plan.  For the Plan to be confirmed over the rejection of an impaired class, the proponent must

show, among other things, that the plan does not discriminate unfairly and that the plan is fair and equitable with respect to each impaired class that has not accepted the plan.

Under Section 1129(b) of the Bankruptcy Code, a plan is "fair and equitable" as to a class if, among other things, the plan provides:  (a) with respect to secured claims, that each holder of a claim included in the rejecting class will receive or retain, on account of its claim, property that has a value as of the Effective Date of the plan, equal to the allowed amount of such claim; and (b) with respect to unsecured claims and interests, that the holder of any claim or interest that is junior to the claims or interest of such class will not receive or retain, on account of such junior claim or interest, any property unless the senior class is paid in full.  The Bankruptcy Court must further find that the economic terms of a plan do not unfairly discriminate as provided in Section 1129(b) of the Bankruptcy Code with respect to the particular objecting class.

**THE DEBTOR BELIEVES THAT THE PLAN HAS BEEN STRUCTURED SO THAT IT WILL SATISFY THE REQUIREMENTS OF SECTION 1129(b) OF THE BANKRUPTCY CODE AND CAN BE CONFIRMED OVER THE REJECTION OF THE PLAN BY SECURED CREDITORS, IF A CRAMDOWN IS REQUESTED.   THE DEBTOR BELIEVES THAT THE UNSECURED CREDITORS WILL SUPPORT THE PLAN SINCE THE ALTERNATIVE, LIQUIDATION, WILL LIKELY PAY THE SECURED CREDITORS THE MAJORITY OF THE ESTATES' ASSETS, LEAVING LITTLE OR NO RETURN TO UNSECURED CREDITORS.**

C.      **Other Requirements for Confirmation**

In order to obtain confirmation of the Plan, the requirements of Section 1129 of the Code must be satisfied.  These requirements include but are not limited to findings that the Plan complies with the applicable provisions of Chapter 11 of the Code, that the Debtor has complied with the applicable provisions of Chapter 11 of the Code, that the Plan has been proposed in good faith and not by any means forbidden by law, and at least one class of impaired claims has voted to accept the Plan.  The Debtor believes that the Plan satisfies all the statutory requirement of Chapter 11 of the Bankruptcy Code.

1.      Best Interest of Creditors

Before the Plan may be confirmed, the Bankruptcy Court must find (with certain exceptions) that the Plan provides, with respect to each class, that each holder of a claim or interest of such class either (a) has accepted the Plan or (b) will receive or retain under the Plan on account of such claim or interest property of a value, as of the effective date, that is not less than the amount that such person would receive or retain if the Debtor was, on the effective date, liquidated under Chapter 7 of the Bankruptcy Code.  As set forth above, the Debtor believes that this test will be satisfied.

    2.    <u>Financial Feasibility</u>

The Bankruptcy Code requires that, in order for the Plan to be confirmed by the bankruptcy court, the bankruptcy court must determine that consummation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor.  The Debtor believes that it will be able to fulfill its obligations under the Plan.

Attached hereto as Exhibit "B" is the Debtor's projection demonstrating the feasibility of the Plan. Exhibit "B" was prepared by Debtor's management from historical data and a projection model that assumes that revenue will be produced as projected by use of the current facilities and equipment.  The Debtor believes that it is sufficient to support additional business and will continue to increase its revenues.  This pro forma indicates that the Debtor will be able to survive on a post-confirmation basis.

To the extent revenue of the Debtor is insufficient to fund the payments on the Effective Date; the equity infusion will be used to fund the Plan.

D.    **<u>Cram-Down - Confirmation Without Acceptance by All Impaired Classes</u>**

The Bankruptcy Code contains provisions for confirmation of a Plan even if the Plan is not accepted by all impaired classes, provided that at least one impaired class of claims has accepted it (determined without including any acceptance by any insider holding a claim of such class).  These "cram-down" provisions, for confirmation of a Plan despite the non-acceptance of one or more impaired classes of claims or interests, are set forth in Section 1129(b) of the Bankruptcy Code.

In the event that any impaired class of claims does not accept the Plan by the requisite majority set out in the introduction, the Debtor must demonstrate to the Bankruptcy Court, with respect to each impaired class which does not accept the Plan that the Plan does not discriminate unfairly, and is "fair and equitable" with respect to that class.  Under the Bankruptcy Code, a Plan is considered "fair and equitable" with respect to secured claims, unsecured claims or interest, as the case may be, if the following conditions are met:

    (a)    <u>Secured Claims</u>.  The holders of such claims retain their liens, to the extent of the allowed amount of their secured claims, and that each holder of such a claim receive on account of such secured claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the Plan, of at least the value of such holder's interest in the estate's interest in the collateral.

    (b)    <u>Unsecured Claims</u>.  Either (i) each impaired unsecured creditor receives or retains under the Plan property of a value as of the effective date of the Plan equal to the amount of its allowed claim, or (ii) the holder of any

claim or interest that is junior to the claims of the dissenting class will not receive or retain any property under the Plan.

The Debtor believes that the Plan meets the "fair and equitable" test and does not discriminate unfairly with respect to any class of creditors or interest holders.  Therefore, the Plan may be confirmed, even if it is rejected by the holders of allowed claims and interests.

## XIV.  CONCLUSION

The information provided in this Disclosure Statement is intended to assist you in voting on the Plan in an informed fashion.  If the Plan is confirmed, you will be bound by its terms. Accordingly, you are urged to make such further inquiries as you may deem appropriate and then cast an informed vote on the Plan.

Respectfully submitted effective this 8th day of May, 2015.

**DIA-DEN LTD.**

**BY: PJJ INC., its general partner**

By:____/s/ Dennis W. Abrahams_____
Dennis W. Abrahams, President

Prepared by:

EDWARD L. ROTHBERG
State Bar No. 17313990
T. JOSH JUDD
State Bar No. 24036866
Galleria Tower II
5051 Westheimer, Suite 1200
Houston, Texas 77056
Telephone: 713.977.8686
Facsimile:  713.977.5395
ATTORNEYS FOR DEBTOR